UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NORLAND D. BELL,

     Plaintiff,

             **MEMORANDUM AND ORDER**

   - against -           14-CV-4759 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

     Defendant.
------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

   Plaintiff Norland D. Bell brings this action against the Commissioner of the Social

Security Administration (the "Commissioner"), pursuant to 42 U.S.C. § 405(g), seeking review

of the Commissioner's determination that he is not entitled to disability insurance benefits under

Title XVI of the Social Security Act.  Bell and the Commissioner have cross-moved for

judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  (Def.'s Mot. J.

Pl.'s (Doc. No. 15); Pl.'s Cross-Mot. J. Pls. (Doc. No. 17).)  For the reasons set forth below,

Bell's motion is denied and the Commissioner's motion is granted.

## BACKGROUND

### I.  Procedural History

   On May 6, 2011, Bell filed an application for Supplemental Security Income benefits

with the Social Security Administration.  (Admin. R. (Doc. No. 21) at 184.)  Bell alleges that he

has been completely disabled since June 26, 2010, due to lumbar and cervical spine sprain and

strain, back pain, patella femoral arthropathy of both knees with sprain and strain, and human

immunodeficiency virus (HIV) positive status.  (*Id.* at 176.)  On January 12, 2012, his

application was denied.  (*Id.* at 101.)  Bell requested a hearing before an administrative law judge

("ALJ"), which occurred before ALJ Lucian A. Vecchio on December 7, 2012.  (*Id.* at 66.)  In a

decision dated January 7, 2013, ALJ Vecchio found that Bell was not disabled during the relevant period, from June 26, 2010 through January 7, 2013. (*Id.* at 34–44.) On June 13, 2014, the decision became final when the Appeals Council denied Bell's request for review. (*Id.* at 1–5.) This action followed.

## II.    The Administrative Record

### a.    Non-Medical Evidence

Bell was born in 1981 and has a high school education. (*Id.* at 70, 155.) He worked steadily in the food service industry until a workplace accident on June 25, 2010. (*Id.* at 70–71, 199–204.) Regarding the workplace accident, Bell testified that he "was pulling a dolly onto a truck and the crate snapped." (*Id.* at 71.) He tried "to catch it and wound up falling." (*Id.*) Bell stated that his back and knee pain began after the accident. (*Id.* at 195.) He requires a cane to walk outside, which he does not often do alone. (*Id.* at 75, 190–91, 193–194, 197.)

Bell lives alone and is able to care for his personal needs. (*Id.* at 187–88.) Three times a week, a home attendant helps him cook, clean, do laundry, and shop, among other chores. (*Id.* at 73, 76, 188, 191.) Bell gets phone calls to remind him to take his medication. (*Id.* at 189.) He generally stays home and does not spend time with others, including his family. (*Id.* at 192.) Bell has two cats, and he enjoys watching television and reading. (*Id.* at 73, 188, 191.)

### b.    Medical Evidence After June 25, 2010, the Alleged Onset Date

#### i.    Interfaith Medical Center

On June 26, 2010, one day after Bell's workplace accident, he went to the emergency room at Interfaith Medical Center with complaints of back pain and headache and reported that he had recently fallen. (*Id.* at 71, 230.) An exam showed decreased flexion in his back and

muscle spasms, for which he was prescribed Tramadol and Robaxin. (*Id.* at 232.) Bell was diagnosed with back strain and was referred to an orthopedic clinic. (*Id.* at 235.)

### ii. Leon M. Bernstein, M.D. – Treating Physician

On July 21, 2010, Bell saw Leon M. Bernstein, M.D., for an initial orthopedic evaluation. (*Id.* at 268–69, 272.) Bell reported pain in his upper and lower back, head, ankles, knee, and both legs. (*Id.* at 272.) He reported his workplace injury and subsequent hospital visit, as well as another incident where he fell at home on July 9, 2010 due to dizziness, after which he went to Brookdale Hospital for treatment. (*Id.*) Dr. Bernstein's examination revealed decreased cervical spine range of motion. (*Id.* at 269.) Examination of Bell's lower extremities revealed normal deep tendon reflexes, slow gait, resolving left leg abrasions, bilateral patella femoral pain/tenderness, and an inability to flex-load with knees. (*Id.*) X-rays of the cervical spine, lumbar spine, and both knees were reportedly normal. (*Id.*) Dr. Bernstein diagnosed sprain and strain of the cervical spine and lumber spines, and patella femoral arthropathy of both knees. (*Id.* at 269, 351.) In an initial report for Workers' Compensation dated July 22, 2010, Dr. Bernstein noted that Bell could not return to work due to his knee injuries, which would last more than fifteen days. (*Id.* at 356.) Dr. Bernstein prescribed physical therapy, analgesic (Tylenol), a lumber spine corset, and a cane, and referred Bell for MRIs of both knees. (*Id.* at 269, 355–56.)

On July 30, 2010, Bell had an MRI of his left knee, which revealed grade III patellar chondromalacia. (*Id.* at 276.) On August 4, 2010, Bell returned to Dr. Bernstein. (*Id.* at 270.) Dr. Bernstein noted that Bell was using a cane, receiving physical therapy, and had decreased knee flexion. (*Id.*) He prescribed continuing physical therapy. (*Id.*) On August 6, 2010, Bell had an MRI of his right knee, which revealed stage II and III patellar chondromalacia and mild arthrosis. (*Id.* at 273.)

On September 1, 2010, Bell returned to Dr. Bernstein, reporting no improvement in his knees with greater symptoms in his left knee. (*Id.* at 270.) Dr. Bernstein noted that Bell was not improving and recommended arthroscopic surgery for both knees. (*Id.*)

On October 4, 2010, Bell returned to Dr. Bernstein, reporting no changes in his symptoms. (*Id.* at 271.) In a Worker's Compensation form, Dr. Bernstein again noted that Bell was one-hundred percent temporarily impaired and would be unable to work for more than fifteen days due to knee pain. (*Id.* at 358.) He prescribed continuing physical therapy. (*Id.*)

On November 4, 2010, Bell returned to Dr. Bernstein, reporting no changes in his symptoms. (*Id.* at 271.) Dr. Bernstein noted no improvement and requested authorization for bilateral knee arthroscopic surgery from workers compensation. (*Id.* at 271, 348.) He again noted that Bell would be unable to return to work for more than fifteen days. (*Id.* at 348.)

On December 2, 2010, Bell returned to Dr. Bernstein, reporting no changes in his symptoms. (*Id.* at 271.) Dr. Bernstein noted that Bell's back and neck pain were better, but his knee impairments continued. (*Id.*) He also noted that Bell's left knee was worse than his right, but both had limited ranges of motion. (*Id.*) He prescribed continuing physical therapy and observed that Bell walked with a cane and took Tylenol and Motrin. (*Id.*) The same day, Dr. Bernstein wrote a doctor's note stating that Bell was under his care for sprain and strain of his cervical and lumbar spine and patella femoral arthropathy of both knees. (*Id.* at 236.) He wrote that Bell had been "totally disabled from work since the date of the injury." (*Id.*) In a Medical Provider's Statement form completed the following day, Dr. Bernstein repeated his diagnoses and listed the following objective findings: normal x-rays of the cervical spine, lumbar spine, and both knees; decreased range of motion of the spine; inability to flexion load on the knees; and MRIs of both knees revealing patella chondromalacia and arthrosis patella. (*Id.* at 359–60.)

Under current treatment, Dr. Bernstein wrote physical therapy, rest, and that an arthroscopy of the knees was pending. (*Id.* at 359.) Dr. Bernstein indicated that Bell was presently unable to work and was expected to be able to return to work in April 2011. (*Id.*) He also indicated that there was no type of job modification or accommodation that would allow Bell to work at the time. (*Id.*) He opined that Bell had been totally disabled from the date of the accident through the present day. (*Id.* at 360.)

On January 3, 2011, Bell returned to Dr. Bernstein. (*Id.* at 274.) Dr. Bernstein noted that Bell's knees were still symptomatic, the left more than the right. (*Id.*) Bell's range of motion in his knees was still decreased, but had improved from 100 degrees to 110 degrees. (*Id.*) Dr. Bernstein indicated that knee arthroscopy was still needed, but that Workers' Compensation had denied the treatment. (*Id.*) He instructed Bell to return after a pending Workers' Compensation hearing where he hoped the denial would be reversed. (*Id.*) In a Workers' Compensation form completed after the visit, Dr. Bernstein again assessed that Bell was one-hundred percent temporarily impaired and stated he could not return to work due to the impairment. (*Id.* at 363.) On February 1, 2011, Bell again returned to Dr. Bernstein, reporting no changes in his symptoms. (*Id.* at 274.) Dr. Bernstein noted bilateral knee pain with flexion-loading, no change in range of motion, and that Bell was still undergoing physical therapy and taking NSAIDs. (*Id.*)

On February 24, 2011, Bell returned to Dr. Bernstein, complaining of continued bilateral knee pain and back pain. (*Id.* at 275.) Bell's range of motion in his knees was still at 110 degrees. (*Id.*) Dr. Bernstein noted that the Workers' Compensation hearing had not resolved the issue of possible knee surgery. (*Id.*) In a Workers' Compensation form completed after the examination, Dr. Bernstein again noted Bell could not return to work for more than fifteen days due to lumbar spine and bilateral knee disability. (*Id.* at 365.) In a progress report dated March

1, 2011, Dr. Bernstein listed Bell's current medical conditions as sprain and strain of the cervical and lumbar spine, patella femoral, and arthropathy of both knees. (*Id.* at 361.) He also wrote that Bell would be unable to return to work for an indeterminate period, pending knee surgery. (*Id.*)

On March 24, 2011, Bell returned to Dr. Bernstein, complaining of continued bilateral knee pain. (*Id.* at 275.) Bell's range of motion in his knees was still at 110 degrees. (*Id.*) Dr. Bernstein prescribed continuing physical therapy and noted that Bell was awaiting authorization for surgery. (*Id.* at 366.) In an Attending Physician's Statement Progress Report completed the same day, Dr. Bernstein noted that Bell was still unable to work, but that he expected Bell would be able to perform some work by July 1, 2011. (*Id.* at 362.) On April 14, 2011, Bell returned to Dr. Bernstein, reporting no change in his symptoms. (*Id.* at 277.) Dr. Bernstein noted a reduced range of motion in his knees, down from 110 degrees to 100 degrees. (*Id.*)

On May 19, 2011, Bell returned to Dr. Bernstein. (*Id.* at 277.) He reported going to the Brookdale emergency department for acute lower back pain a few days earlier and said he had been prescribed NSAIDs. (*Id.*) Bell's range of motion in his knees was 110 degrees. (*Id.*) His range of motion in his lumbar and cervical spine were decreased. (*Id.*) Again, Dr. Bernstein noted on a Workers' Compensation form that Bell could not return to work due to his impairments. (*Id.* at 368.)

On June 23, 2011, Bell returned to Dr. Bernstein, complaining of knee and lower back pain. (*Id.* at 278.) Dr. Bernstein noted that Bell's knee range of motion was still 110 degrees and that Bell was experiencing pain and inability to flexion-load without support. (*Id.*) He wrote that Bell's lumbar spine range of motion was decreased. (*Id.*) On June 24, 2011, Dr. Bernstein reviewed a lumbar spine MRI taken July 1, 2010 and reported that it was normal. (*Id.* at 279.)

On July 28, 2011, Bell visited Dr. Bernstein again, complaining of cervical spine pain and lumbar spine pain. (*Id.* at 344.) Bell rated his cervical spine pain as "0-2/10" and his lumbar spine pain as "7/10." (*Id.*) He also reported that his knees occasionally gave out. (*Id.*) Dr. Bernstein noted that Bell's knee range of motion was still 110 degrees. (*Id.*) In a Workers' Compensation form completed that day, Dr. Bernstein noted that Bell could not return to work because of his impairments. (*Id.* at 367.) On August 18, 2011, Bell returned to Dr. Bernstein with the same complaints as his previous visit. (*Id.* at 344.) Dr. Bernstein noted that Bell could not flex-load his knees due to bilateral anterior patellar pain. (*Id.*)

On June 23, 2011, Bell returned to Dr. Bernstein, complaining of knee and lower back pain. (*Id.* at 278.) Dr. Bernstein noted that Bell's knee range of motion was still 110 degrees and that Bell was experiencing pain and inability to flexion-load without support. (*Id.*) He wrote that Bell's lumbar spine range of motion was decreased. (*Id.*) On June 24, 2011, Dr. Bernstein reviewed a lumbar spine MRI taken July 1, 2010 and reported that it was normal. (*Id.* at 279.)

On July 28, 2011, Bell visited Dr. Bernstein again, complaining of cervical spine pain and lumbar spine pain. (*Id.* at 344.) Bell rated his cervical spine pain as "0-2/10" and his lumbar spine pain as "7/10." (*Id.*) He also reported that his knees occasionally gave out. (*Id.*) Dr. Bernstein noted that Bell's knee range of motion was still 110 degrees. (*Id.*) In a Workers' Compensation form completed that day, Dr. Bernstein noted that Bell could not return to work because of his impairments. (*Id.* at 367.) On August 18, 2011, Bell returned to Dr. Bernstein with the same complaints as his previous visit. (*Id.* at 344.) Dr. Bernstein noted that Bell could not flex-load his knees due to bilateral anterior patellar pain. (*Id.*)

On January 10, 2012, Bell returned to Dr. Bernstein, complaining of bilateral patellar knee, neck, and lower back pain. (*Id.* at 345.) Examination revealed Bell's knee range of motion

to be 110 degrees.  (*Id.*)  Lumbar spine flexion was decreased.  (*Id.*)  Dr. Bernstein continued his prescription for physical therapy.  (*Id.* at 371.)  In a Workers' Compensation form completed the same day, he stated that Bell could not return to work because of his knees and lumbar spine. (*Id.*)  Dr. Bernstein also noted that Bell had either retired or had a disability termination from his employer.  (*Id.*)  On May 14, 2012, Bell returned to Dr. Bernstein, complaining of bilateral patellar knee pain with flexion-loading activities.  (*Id.* at 345.)  Dr. Bernstein noted that Bell's insurance had stopped the physical therapy, but Bell continued to do quadriceps exercises with ankle weights on his own.  (*Id.*)  In a Workers' Compensation form completed that day, Dr. Bernstein stated that Bell could not return to work due to his bilateral knee impairment and that Bell was still waiting for surgery authorization for both knees.  (*Id.* at 372.)  On August 20, 2012, Bell returned to Dr. Bernstein, reporting that he was again in physical therapy and that there were no changes in his symptoms.  (*Id.* at 346.)  On October 10, 2012, Bell returned to Dr. Bernstein, complaining that knee pain prevented prolonged walking, standing, climbing, bending, and squatting.  (*Id.*)  He continued to receive physical therapy and use his cane.  (*Id.*)  There were no changes in his knee range of motion, but there was audible crepitus.  (*Id.*)

Dr. Bernstein completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form on October 16, 2012.  (*Id.* at 298–303.)  He opined that Bell could occasionally lift and carry up to ten pounds; sit for one hour at a time and four hours total in an eight-hour workday; stand for one hour at a time and two hours total; and walk for one hour at a time and one hour total.  (*Id.* at 298–99.)  Dr. Bernstein stated that Bell required the use of a cane to ambulate, but that he could ambulate without the use of a cane for five blocks on level surfaces.  (*Id.* at 299.)  Dr. Bernstein stated that Bell's cane was medically necessary, and, with

the cane, he could use his free hand to carry small objects.  (*Id.*)   Dr. Bernstein stated that his

assessment of limitations was based on bilateral knee patella-femoral arthropathy.  (*Id.*)

Dr. Bernstein further opined that Bell could frequently use his hands for handling,

fingering, feeling, and reaching overhead, and he was limited to occasional reaching in other

directions and occasional pushing and pulling.  (*Id.* at 300.)  Dr. Bernstein opined that, due to

bilateral patella-femoral dysfunction or arthropathy, Bell could only occasionally stoop.  (*Id.* at

301.)  He could never: operate foot controls; climb stairs, ramps, ladders, or scaffolds; balance;

kneel; crouch; crawl; or tolerate exposure to unprotected heights, moving mechanical parts,

humidity and wetness, extreme cold, or vibrations.  (*Id.* at 300–02.)  He could tolerate minimal

exposure to operating a motor vehicle.  (*Id.* at 302.)  Also due to bilateral knee arthropathy and

patella-femoral impairment, Dr. Bernstein opined that Bell could not walk a block at a

reasonable pace on rough or uneven surfaces, use standard public transportation, or climb a few

steps at a reasonable pace with the use of a single hand rail.  (*Id.* at 303.)  Bell could perform

activities such as shopping, travel without a companion for assistance, ambulate without using

two canes, prepare a simple meal and feed himself, care for his personal hygiene, and sort,

handle, and use paper or files.  (*Id.*)  Dr. Bernstein stated that Bell's assessed limitations had

been present since June 25, 2010, and that they had lasted or would continue to last for twelve

months.  (*Id.*)

On November 14, 2012, Bell returned to Dr. Bernstein, reporting no changes.  (*Id.* at

347.)  He continued to perform physical therapy exercises at home and use his cane.  (*Id.*)  Dr.

Bernstein noted a decrease in Bell's knee range of motion to 100 degrees and mild crepitus on

the left knee.  (*Id.*)  He noted that he had been waiting for authorization to perform bilateral knee

surgery since September 2010.  (*Id.*)  Dr. Bernstein's assessment of Bell's disability for Workers' Compensation was unchanged.  (*Id.* at 375.)

### iii.  Marcellus Walker, M.D. – Treating Physician

On August 9, 2010, Bell presented to Marcellus Walker, M.D., at Brownsville Community Development ("Brownsville") for treatment of HIV.  (*Id.* at 245–47.)  Bell reported that he was initially diagnosed with HIV on August 9, 2004 and that he was not taking antiretroviral medication.  (*Id.* at 245–46.)  Dr. Walker found no AIDS defining criteria and Bell denied related symptoms.  (*Id.* at 245.)  Dr. Walker diagnosed asymptomatic HIV and ordered blood tests.  (*Id.* at 246.)  On August 26, 2010, Bell returned to see Dr. Walker.  (*Id.* at 248.)  Dr. Walker noted that Bell suffered from a chronic backache and had a chronic deformity and a torn ligament in his left knee.  (*Id.* at 248.)  Bell was referred to rehabilitation for his backache.  (*Id.*)

On September 9 and 30, 2010, Bell returned to Dr. Walker.  (*Id.* at 250–53.)  At both appointments, Dr. Walker prescribed Doxycycline.  (*Id.* at 251, 253.)

On November 1, 2010, Bell returned to Dr. Walker, complaining of dizziness and stomach pain.  (*Id.* at 254.)  Dr. Walker ordered blood tests, recommended oral probiotics, and noted that Bell's CD4 count indicated he should be taking HIV medication.  (*Id.* at 255–56.)

On November 15, 2010, Bell returned to Dr. Walker, reporting symptoms of a cold, appetite changes, and trouble swallowing.  (*Id.* at 257–58.)  Dr. Walker diagnosed asymptomatic HIV, acute upper respiratory infection, acute pharyngitis, and anorexia.  (*Id.* at 258.)  He prescribed Zithromax, Diflucan, and Cyproheptadine.  (*Id.*)

On December 13, 2010, Bell returned to Dr. Walker.  (*Id.* at 259–61.)  Dr. Walker noted that Bell's pharyngitis had resolved and a musculoskeletal exam revealed no joint deformity or abnormalities and a normal range of motion.  (*Id.* at 260.)  Dr. Walker noted that Bell would start

HAART therapy the following day and prescribed the HIV medications Truvada, Prezista, and Norvir. (*Id.* at 259–60.)

On March 7, 2011, Bell returned to Dr. Walker, complaining of headache, nausea, and moderate bilateral knee aches. (*Id.* at 262–63.) Musculoskeletal exam revealed bilateral knee tenderness. (*Id.* at 263.) Dr. Walker continued Bell on HIV medication and ordered additional blood testing. (*Id.*)

On April 27, 2011, Bell returned to Dr. Walker for follow up on his blood testing and back pain. (*Id.* at 264.) Dr. Walker continued Bell on his HIV medications. (*Id.*)

### iv. Irene Chow, D.O. – Consultative Examiner

On February 16, 2011, Irene Chow, D.O., performed a consultative internal medicine examination. (*Id.* at 237–43.) Bell reported back pain brought on by walking one block or standing five minutes, bilateral knee pain, and a history of HIV. (*Id.* at 237–38.) He stated he was receiving physical therapy for his back and knee pain, which was helpful. (*Id.* at 237.) Bell also stated that he took HIV medication and Motrin and Tylenol for his pain. (*Id.* at 238.) Dr. Chow noted that Bell wore a back support and used a cane, though the cane was not medically necessary. (*Id.* at 237, 239.) Regarding his activities of daily living, Bell reported that he lived alone, he was able to shower and dress himself, and he did the cooking, cleaning, laundry, and shopping when he was not in pain. (*Id.* at 238.)

On examination, Bell appeared to be in no acute distress. (*Id.* at 239.) He could walk on his heels and toes without difficulty, needed no help changing for the examination or getting onto the table, and was able to make a full squat. (*Id.*) Musculoskeletal examination revealed full ranges of motion of the cervical spine and knees. (*Id.* at 240.) Bell's joints were stable and non-tender. (*Id.*) X-rays of the left knee revealed a question of small suprapatellar joint effusion.

(*Id.*)  Based on her examination, Dr. Chow concluded that Bell had no physical limitations.  (*Id.* at 241.)

### v.  Brookdale Hospital and Clinic

On May 14, 2011, Bell had a scrotal ultrasound and chest x-ray at the Brookdale Hospital.  (*Id.* at 266–67.)  The ultrasound revealed left scrotal edema with hyperemia superomedial to the left testes.  (*Id.* at 266.)  A chest x-ray revealed no abnormal findings.  (*Id.* at 267.)

On June 20, 2011, Bell went to the primary care clinic at Brookdale.  (*Id.* at 288.)  He reported his 2004 HIV diagnosis, his June 2010 leg injury, and that he had not taken his HIV medication for the past three months.  (*Id.*)  Continued adherence counseling was advised.  (*Id.*)

On October 17, 2011, Bell presented to neurologist Gary S. Friedman, M.D. at the Brookdale Clinic.  (*Id.* at 281–83, 287–88.)  Bell reported bilateral weakness and torn ligaments in both knees and complained of middle and lower back pain he'd been experiencing since his workplace accident.  (*Id.* at 281.)  He described problems with his balance and previous falls. (*Id.*)  Bell stated that his past medical history involved HIV and depression with psychotic features.  (*Id.*)  He also stated that he was in pain management treatment, but was not receiving narcotics.  (*Id.* at 281–82.)  Bell reported taking Truvada, Norvir, Prezista, Bactrim, and Advil. (*Id.* at 282.)

Examination revealed that Bell had decreased lumbar spine ranges of motion, positive straight leg raising, lumbar paraspinal tenderness, mildly unsteady tandem walking, wide-based cautious gait, and suggestions of antalgic gait without cane.  (*Id.*)  There was bilateral knee medial joint line tenderness, but no instability.  (*Id.* at 283.)  Dr. Friedman diagnosed thoracolumbar strain, HIV with a question of central nervous system damage, and bilateral knee

medial meniscus tears. (*Id.*) He noted Bell's reports of balance problems possibly due to light-headedness or vertigo. (*Id.*) Dr. Friedman referred Bell for a brain MRI to rule out a left brain lesion and brain damage from HIV. (*Id.*) He prescribed Meclizine and a trial of physical therapy for imbalance and ordered blood testing. (*Id.* at 283, 287.)

### vi.  Jerome Caiati, M.D. – Consultative Examiner

On November 1, 2011, Bell underwent a consultative examination by Jerome Caiati, M.D., an internal medicine specialist. (*Id.* at 289–92.) Bell complained of dizziness, loss of consciousness, back pain, and bilateral knee pain. (*Id.* at 289.) He reported four hospitalizations in the last two years: in June 2010 for his workplace injury; in July 2010 after falling in his apartment; in May 2011 for weakness, loss of consciousness, and treatment of an abscess; and again in May 2011 for incision and drainage of an abscess. (*Id.*) Bell stated he was currently taking Bactrim, Prezista, Truvada, Norvir, Citalopram, and Seroquel. (*Id.*) He reported that he lived alone and was able to shower and dress himself. (*Id.* at 290.) Bell stated that he couldn't cook because of his back pain and had a home attendant who cleaned, did laundry, and shopped for him. (*Id.*)

On examination, Bell was in no acute distress. (*Id.*) His station and gait were normal. (*Id.*) He could walk on his heels and toes without difficulty, but complained of lower back pain when squatting half way. (*Id.*) Bell stated that he used his cane for pain, but Dr. Caiati noted that he did not use it consistently throughout the examination and that it was not medically necessary. (*Id.*) Examination of Bell's cervical spine, upper extremities, and hands revealed normal findings and full ranges of motion. (*Id.*) Examination of Bell's thoracic and lumbar spine revealed that flexion to 80 degrees caused lower back pain. (*Id.*) There was no spinal or paraspinal tenderness, spasm, scoliosis, or kyphosis. (*Id.* at 290–91.) Straight leg raising in

sitting and supine positions also caused lower back pain. (*Id.* at 291.) Knee ranges of motion revealed flexion to 140 degrees and extension to 180 degrees bilaterally. (*Id.*) Dr. Caiati diagnosed: history of dizziness and loss of consciousness; history of back pain, diagnosis unclear; and history of bilateral knee pain, diagnosis unclear. (*Id.*) Dr. Caiati postulated that Bell had no restrictions in sitting, standing, walking, reaching, pushing, pulling, and climbing; however, Bell was minimally limited in bending and lifting due to lower back pain. (*Id.*) Finally, Dr. Caiati noted that he had no doctor patient relationship with Bell. (*Id.*)

### vii. Louis Tranese, D.O. – Consultative Examiner

On October 18, 2012, Bell underwent a consultative exam by Louis Tranese, D.O., a physical medicine and rehabilitation specialist. (*Id.* at 304–07.) Dr. Tranese was not able to review any medical records or radiologic reports as part of the consultation. (*Id.* at 304.) Bell complained of lower back pain and daily bilateral knee pain, with greater pain in his left knee than his right knee. (*Id.*) Bell stated that his knee pain was aggravated by weight-bearing activities, such as walking, standing for long periods, stair climbing, squatting, and kneeling. (*Id.*) Bell reported mild temporary relief with over-the-counter anti-inflammatory medications, position changes, and rest. (*Id.*) He also reported that he was currently taking HIV medications, his viral load had been undetectable, his CD4 count was over 300, and that he'd been diagnosed with AIDS the previous year after having oral and pharyngeal thrush. (*Id.*) He stated that he had been treated for the thrush and denied any other HIV or AIDS related complications. (*Id.* at 304–05.) Bell listed his current medications as Prezista, Norvir, Truvada, and Trileptal. (*Id.* at 305.) He reported that he lived alone and could independently bathe, dress, and groom himself. (*Id.*) He stated that he cooked independently twice a week, but that he required assistance for shopping, cleaning, and laundry. (*Id.*)

On examination, Bell was not in acute distress. (*Id.*) His stance was normal, and he could walk on his heels and toes without difficulty while holding onto the examination table. (*Id.*) Bell was unable to squat beyond forty percent of maximum capacity due to reported knee pain. (*Id.*) His gait was normal. (*Id.* at 305.) He presented with his cane, which Dr. Tranese noted was only medically necessary for walking long distances or outdoor ambulation. (*Id.*) Bell did not need help changing for the examination or getting on and off the examination table, and he was able to rise from a chair without difficulty. (*Id.*) Musculoskeletal examination revealed full ranges of motion in the cervical spine and lumbar spine. (*Id.* at 306.) Bell reported mild lower lumbar paraspinal tenderness. (*Id.*) Straight leg raising was negative bilaterally. (*Id.*) Ranges of motion were full in the hips, ankles, and right knee. (*Id.*) The left knee revealed range of motion to 130 degrees limited by pain at the end point. (*Id.*) There was minimal inflammation and medial joint line tenderness in the left knee. (*Id.* at 306.) There was no effusion or instability, and the remainder of the bilateral upper and lower extremity joints were stable and not tender. (*Id.*) Neurologic examination revealed physiologic and equal deep tendon reflexes, no sensory deficit, and full strength in upper and lower extremities. (*Id.*) Extremities revealed no evidence of muscle atrophy. (*Id.*) Dr. Tranese diagnosed history of HIV/AIDS, lower back pain, and bilateral knee pain. (*Id.* at 307.) He concluded that Bell had: a mild to moderate restriction with frequent squatting, kneeling, or repetitive stair climbing; mild restriction with standing for long periods and walking extended distances; mild restriction with frequent bending; and mild to moderate restriction with heavy lifting. (*Id.*) Finally, Dr. Tranese noted that he had no doctor patient relationship with Bell. (*Id.*)

Dr. Tranese also completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) form on October 18, 2012. (*Id.* at 308–13.) He assessed that Bell could:

continuously lift and carry twenty pounds; sit for eight hours at one time; stand for six hours at one time and seven hours total in an eight hour work day; and walk for four hours at one time and eight hours total.  (*Id.* at 308–09.)  He stated that Bell required the use of a cane to ambulate, and he could ambulate without a cane for approximately two blocks.  (*Id.* at 309.)  He stated that the cane was medically necessary, and, with a cane, Bell could use his free hand to carry small objects.  (*Id.*)  As support for his assessment, Dr. Tranese listed findings of a history of back injury and bilateral knee injuries, lumbar paraspinal muscle tenderness, and limited tolerance to squatting of greater than forty percent maximum capacity.  (*Id.* at 308–09.)  He further concluded that Bell could continuously use his hands for reaching, handling, fingering, feeling, pushing, and pulling; and he could continuously use his feet to operate foot controls.  (*Id.* at 310.)  Bell could occasionally climb ladders and scaffolds; frequently climb stairs and ramps, stoop, and kneel; and continuously balance, crouch, and crawl.  (*Id.* at 311.)  He could also tolerate continuous exposure to environmental conditions, including unprotected heights, moving mechanical parts, operating a motor vehicle, extreme cold, and vibrations.  (*Id.* at 312.)  Dr. Tranese concluded that Bell could perform activities such as shopping, travelling without a companion for assistance, ambulating without using two canes, walking a block at a reasonable pace on rough or uneven surfaces, using standard public transportation, climbing a few steps at a reasonable pace with the use of a single hand rail, preparing a simple meal and feeding himself, caring for his personal hygiene, and sorting, handling, and using paper or files.  (*Id.* at 313.)  He commented that Bell's assessed limitations had lasted or were expected to last for twelve months.  (*Id.*)

### c. Medical Expert Testimony

At Bell's December 7, 2012 hearing, Charles Plotz, M.D., an internist with a subspecialty in rheumatology, testified as an impartial medical expert. (*Id.* at 81–87.) Based on a review of the medical evidence, he opined that HIV was not a significant medical problem at the time given that Bell's only complication was a single episode of thrush. (*Id.* at 83.) Dr. Plotz next discussed Bell's workplace injury and opined that there was "[n]o reason for arthroscopic surgery" given the MRIs of Bell's knees, which "d[id] not indicate any internal derangement." (*Id.*) He opined that Bell's impairments did not meet or medically equal the criteria of an impairment in the Listing of Impairments. (*Id.* at 84.) He concluded that there was no reason why Bell could not perform work at the sedentary exertion level. (*Id.* at 85.)

On cross-examination, Bell's attorney raised questions related to Chondromalacia in relation to Bell's knee MRIs. (*Id.* at 86.) Dr. Plotz stated that he "d[id] not believe it is a serious condition." (*Id.*)

### d. The Decision of the ALJ

On January 7, 2013, ALJ Vecchio issued a decision finding that Bell was not disabled during the relevant period. (*Id.* at 34–44.) First, the ALJ found that Bell had not engaged in substantial gainful activity since June 26, 2010. (*Id.* at 40.) Second, the ALJ found that Bell had severe impairments of HIV, chronic back pain, bilateral knee sprain and strain, and patella-femoral arthropathy. (*Id.*) Third, the ALJ found that these impairments did not meet or equal the criteria of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) The ALJ then assessed Bell's residual functional capacity and concluded that he had the ability to perform sedentary work, except that he needed a cane for walking long distances and had mild limitations for bending. (*Id.* at 41.) Fourth, the ALJ found that Bell could not perform his past relevant

work.  (*Id.* at 44.)  Fifth, the ALJ found that jobs existed in significant numbers in the national and local economies that Bell could perform. (*Id.*)  Accordingly, the ALJ found that Bell was not disabled.  (*Id.*)

### e.  The Appeals Council

Bell submitted additional medical evidence to the Appeals Council in connection with his claim.  Relating to his HIV treatment, he submitted blood testing from Brookdale Hospital done in May, August, November, and December 2012 and in February of 2013.  (*Id.* at 22–24.)

Bell also submitted records relating to his knee impairments.  On March 29, 2013, Bell underwent left knee surgery with arthroscopy, partial medial meniscectomy, and abrasion chondroplasty.  (*Id.* at 25–28.)  On April 1, 2013, Bell returned to Dr. Bernstein, who prescribed physical therapy.  (*Id.* at 19–21.)  On June 14, 2013, Bell underwent right knee surgery, with postoperative diagnoses of medial meniscal tears, hypertrophic multi-compartment synovitis, chondromalacia patella grave IV, and chondromalacia medial III to IV femoral condoyle.  (*Id.* at 29–30.)

Bell submitted additional records relating to his mental health treatment.  On April 27, 2013, Bell went to the Brookdale Hospital emergency department, complaining of depression. (*Id.* at 7.)  Intake records state that he was paranoid, grandiose, and was telling hospital staff that he wanted to write a book.  (*Id.*)  Bell was admitted that day.  (*Id.* at 8.)  On May 7, 2013, Bell was discharged with a diagnosis of bipolar disorder-depressed and post-traumatic stress disorder. (*Id.* at 6–7, 18.)

On June 13, 2014, the Appeals Council denied Bell's request for review.  (*Id.* at 1–5.)

**STANDARD OF REVIEW**

**I.      Review of Denial of Social Security Benefits**

The Court does not make an independent determination about whether a claimant is disabled when reviewing the final determination of the Commissioner. *See Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmerman v. Colvin*, No. 13-CV-241, 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.    Eligibility for Disability Benefits

To qualify for disability insurance benefits, an individual must show that she is unable

"to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(2)(A).

This requires a five-step analysis for determining whether a claimant is disabled:

> [1] First, the Commissioner considers whether the claimant is currently engaged
> in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or mental ability to do
> basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based
> solely on medical evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations.  If the claimant has such an impairment, the
> Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is
> whether, despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner
> then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d

1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. §§ 404.1520, 416.920.  The claimant has the

burden of proof for the first four steps of the analysis, but the burden shifts to the Commissioner

for the fifth step.  *See Talavera*, 697 F.3d at 151.

## DISCUSSION

In support of his motion for judgment on the pleadings, Bell argues that (1) the ALJ

failed to follow the treating physician rule, and that (2) the Appeals Council failed to adequately

consider new and material evidence.  (Pl.'s Mem. L. Supp. Mot. J. Pls. ("Pl.'s Mem.") (Doc. No.

18) at 16, 19.)  The Commissioner argues that the Commissioner correctly determined that Bell

was not disabled.  (Def.'s Mem. L. Supp. Mot. J. Pls. ("Def.'s Mem.") (Doc. No. 16) at 32 (ECF

Pagination).)

## I.      The Treating Physician Rule

The regulations governing the ALJ's deliberation state that:

> Generally, [the ALJ] give[s] more weight to opinions from [a claimant's] treating
> sources, since these sources are likely to be the medical professionals most able to
> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)
> and may bring a unique perspective to the medical evidence that cannot be
> obtained from the objective medical findings alone or from reports of individual
> examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2).  The treating physician's opinion on the nature and severity of the

patient's impairment is generally given controlling weight if it is supported by "medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in [the claimant's] case record."  *Id.*

Where the ALJ assigns less than controlling weight to the treating physician's opinion, he

is required to provide "good reasons" for doing so.  *Id.* ("We will always give good reasons in

our notice of determination or decision for the weight we give your treating source's opinion.");

*see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations as valid

and binding on the courts).  In deciding how much weight to give the opinion, the ALJ must

consider "(i) the frequency of examination and the length, nature and extent of the treatment

relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency

of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v)

other factors brought to the Social Security Administration's attention that tend to support or

contradict the opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R.

§ 404.1527(d)(2)).

ALJ Vecchio accorded "no weight" to the opinion of Bell's treating orthopedist Leon Bernstein.  (Admin. R. at 42.)  While Dr. Bernstein is a specialist and had a long and consistent treatment history with Bell, the ALJ found that his opinion was "widely inconsistent with his own objective findings; with [Bell]'s admitted activities of daily living; with other findings throughout the record; and with the opinion of the objective medical expert, Dr. Plotz . . . ."  (*Id.*)

For example, Dr. Bernstein consistently found that Bell had a range up motion up to 100 or 110 degrees in his knees and that Bell could shop, travel, and prepare meals by himself.  (*Id.* at 274–75, 303, 345–46.)  Yet, Dr. Bernstein concluded that Bell was completely temporarily disabled and unable to work.  (*Id.* at 236, 348–50, 356–66, 368–75.)  Dr. Bernstein also consistently noted that Bell was disabled by bilateral knee pain with flexion-loading.  (*Id.* at 274, 278, 345, 359.)  However, flexion-loading is not a requirement of sedentary work.  *See* 20 C.F.R. § 404.1567 ("Jobs are sedentary if walking and standing are required occasionally . . . .").  When the ALJ pointed this out and asked Bell why he could not perform a job answering phones or greeting people as they walked into a business, Bell answered that he "suffer[s] from, like, a lot of memory loss."  (Admin. R. at 74.)  While the ALJ agreed with Dr. Bernstein's opinion that Bell could not do his previous work, he found that the record evidence conflicted with Dr. Bernstein's opinion that Bell's limitations would keep him from performing even sedentary work.  (*Id.* at 44, 298–99.)  *See Rosa v. Callahan*, 168 F.3d 72, 78 n.3 (2d Cir. 1999) ("Sedentary work is the least rigorous of the five categories of work recognized by SSA regulations." (internal quotation marks and citation omitted)).

In addition, ALJ explained that Dr. Bernstein's assessment was in conflict with that of Dr. Caiati, Dr. Tranese, and Dr. Plotz.  (Admin. R. at 42.)  Dr. Caiati's exam revealed mostly normal finding and he concluded that Bell had only minimal limitations in bending and lifting.

(*Id.* at 291.)  Similarly, Dr. Tranese's exam revealed mostly normal findings, including that Bell could walk normally, rise from a chair without difficulty, and extend his knees up to 130 degrees "limited by pain at endpoint."  (*Id.* at 305–13.)  Dr. Plotz testified that examinations revealed that there were no neurological deficits in Bell's back and straight leg raising tests were normal.  (*Id.* at 83–86.)  He noted that MRIs of both knees did not indicate internal derangement and that chondromalacia was a benign condition.  (*Id.* at 86.)  As the ALJ found, such medical evidence conflicts with Dr. Bernstein's findings that Bell is completely temporarily disabled.  (*Id.* at 42, 357–58, 363, 365–75.)

The ALJ noted multiple inconsistencies between Dr. Bernstein's opinion and the other medical and non-medical evidence on the record.  The ALJ thus gave "good reasons" for according the opinion no weight.  *See, e.g.*, *Priel v. Astrue*, 453 F. App'x 84, 86 (2d Cir. 2011) ("Upon our review of the record, we conclude that the ALJ properly declined to accord controlling weight to the opinion of Dr. Young because it was inconsistent in material respects with other substantial evidence.").  As such, substantial evidence supports the ALJ's determination here.

## II.      New Evidence Submitted to the Appeals Council

In support of his claim for disability, Bell submitted new evidence for the Appeals Council's review.  The regulations direct the Appeals Council to consider "new and material evidence only where it relates to the period on or before the date of the administrative law judge hearing decision."  20 C.F.R. § 404.970(b).  "Evidence is 'new' if it was not considered by the ALJ and is 'not merely cumulative of what is already in the record,' and it is 'material' if it 'is both relevant to the claimant's condition during the time period for which benefits were denied and probative.'"  *Sistrunk v. Colvin*, No. 14-CV-3208, 2015 WL 403207, at *7 (E.D.N.Y. Jan.

28, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 60 (2d Cir. 1991)). "Materiality also requires 'a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide the claimant's application differently.'" *Id.* (quoting *Jones*, 949 F.2d at 60).

The majority of the evidence submitted to the Appeals Council did not concern the relevant time period. Bell's surgeries occurred on March 29 and June 14, 2013, several months after the ALJ denied Bell's claims. (Admin. R. at 25–30.) Likewise, Bell's hospitalization occurred in April 2013, after the relevant period. (*Id.* at 6–18.) While Bell's blood tests and reports from Dr. Bernstein concerned the relevant period, they do not provide any new, material evidence. (*Id.* at 19–21, 22–24.) The material from Dr. Bernstein contained no examination findings and the opinion therein is consistent with Dr. Bernstein's previous reports that were before the ALJ. Thus the newly submitted information was not "new" pursuant to 20 C.F.R. § 404.970(b).

Moreover, the evidence would not have changed the ALJ's findings. The ALJ determined that Bell was not disabled on or before January 7, 2013. (Admin. R. at 38.) Thus, post-operational diagnoses of Bell's knees from March and June 2013 would not have changed the ALJ's finding that Bell was not disabled on or before January 7, 2013. To the extent those findings could be considered relevant to the severity of Bell's knee impairments during the time period at issue, the ALJ had already found that Bell was limited to performing sedentary work. (*Id.* at 41.) This evidence would not have changed the ALJ's assessment that Bell's knee impairments did not hinder him from such work. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (finding that new evidence did not provide a basis for altering the ALJ's findings where the evidence did "not contradict the ALJ's finding that Perez was capable of performing sedentary work"). In regards to Bell's mental health hospitalization, Bell did not apply for

disability benefits for mental impairments.  *See, e.g., Ferguson v. Astrue*, No. 12-CV-0183, 2013 WL 639308, at *4 (N.D.N.Y. Feb. 21, 2013) (finding that new evidence did not provide a basis for altering the ALJ's findings where "it pertained exclusively to new disabilities plaintiff allegedly began to suffer after the administrative hearing").  As such, the evidence could not have changed the ALJ's opinion that Bell was not disabled by his back and knee impairments or his HIV positive status.

In sum, the evidence submitted by Bell to the Appeals Council would not have changed the ALJ's determination that Bell was limited to only sedentary work.  Substantial evidence supported the ALJ's determination and the Appeals Council did not err in declining to disturb it.

## CONCLUSION

For the reasons stated herein, Bell's motion for judgment on the pleadings is denied, and defendant's motion for judgment on the pleadings is granted.

The Clerk of Court is directed to enter judgment accordingly and close the case.


SO ORDERED.


Dated: Brooklyn, New York
       March 28, 2016

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge